IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   12-cv-02760-WYD

KENNETH L. JIMINEZ,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security[1],

      Defendant.

---

## ORDER

---

THIS MATTER is before the Court on review of the Commissioner's decision that denied Plaintiff's application for Supplemental Security Income ["SSI"] benefits.  For the reasons stated below, this case is reversed and remanded to the Commissioner for further fact finding.

I.    BACKGROUND

Plaintiff, born in 1984, filed for SSI benefits on September 23, 2008, when he was 24 years old.  (Administrative Record ["AR"] 11, 103-05.)  He alleged that he was disabled due to seizures, which he had since childhood, and shoulder and back pain. (*Id.* 142.)[2]  After Plaintiff's application was denied initially (*id.* 52-54), he requested a hearing before an administrative law judge ["ALJ"].  A hearing was held in August 2010

---

[1]  Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant pursuant to Fed. R. Civ. P. 25(d).

[2]  Only Plaintiff's seizure disorder is at issue in this appeal.

(*id*. 23-49), and the ALJ issued a decision on February 23, 2011, finding that Plaintiff was not disabled at step five of the sequential evaluation. (*Id*. 11-18.)

More specifically, at step one the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his application date. (AR 13.) At step two, the ALJ found that Plaintiff had severe impairments of "history of back pain, unknown etiology, history of dislocations, right shoulder and seizure disorder." (*Id*.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments did met or medically equaled one of the listed impairments. (*Id*.)

The ALJ then assessed Plaintiff's residual functional capacity ["RFC"]. (AR 13-17.) She found that Plaintiff could physically perform light work with the following limitations:

> could lift or carry ten pounds frequently and 20 pounds occasionally; could stand or walk, with normal breaks, for a total of six hours in an eight hour workday; could sit, with normal breaks, for a total of six hours in an eight hour workday; could perform pushing and pulling motions with his upper and lower extremities within the aforementioned weight restrictions; should avoid unprotected heights or moving machinery; could frequently perform the postural activities of climbing, balancing, stooping, crouching, kneeling or crawling; should not climb ladders, ropes or scaffolds and could frequently perform overhead reaching and handling with his dominant right upper extremity.

(*Id*. 13-14.) The ALJ also noted that Plaintiff is a younger individual within the meaning of the Social Security Act with a limited education. (*Id*. 17.)

At step four, the ALJ found that Plaintiff has no past relevant work. (AR 17.) At step five, relying on vocational expert testimony, the ALJ found that Plaintiff could perform other work existing in significant numbers in the national economy. (*Id*. 17-18.)

Thus, the ALJ found that Plaintiff was not disabled since September 23, 2008, the date the application was filed. (*Id.* 18.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision (AR 1-6), making the ALJ's June 2010 decision the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 422.210(a). Plaintiff timely requested judicial review, and this appeal followed.

Plaintiff argues that the ALJ did not properly evaluate the treating physicians' opinions, did not properly evaluate at step three whether Plaintiff meets a listing for epilepsy/seizures, and improperly rejected the testimony of lay witness Pamela Barela. He also argues that the court should award benefits rather than remanding for another hearing as he asserts that he meets the requirements of Listing 11.02 found at 20 C.F.R. Pt. 404, Subpt. B, App. 1.

II.   ANALYSIS

A.   Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence. *Hamilton v. Sec. of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990). "It requires more than a scintilla of evidence but less than a preponderance of the evidence." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

The ALJ's decision must be evaluated "based solely on the reasons given stated in the decision." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A post-hoc rationale is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance. *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008). Thus, I will not consider post-hoc arguments of the Commissioner.

B.     The Merits of Plaintiff's Arguments

1.     Whether the ALJ Erred At Step Three and in Assessing the Testimony of Lay Witness Pamela Barela

"'At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges as so severe as to preclude substantial gainful activity.'" *Drapeau v. Massanari*, 255 F.3d 1211, 1212 (10th Cir. 2001) (quotations omitted). An ALJ is required "to discuss the evidence and explain why he found that [a claimant] was not disabled at step three." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). As noted in *Clifton*:

> In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to

arrive at that conclusion. The record must demonstrate that the ALJ considered all of the evidence. . . .

*Id.*

Plaintiff contends that the ALJ erred in regard to her assessment of Listing 11.02. That Listing, entitled "Epilepsy – convulsive epilepsy (grand mal or psychomotor)", requires a "detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least three months of treatment" with "[d]aytime episodes (loss of consciousness and convulsive seizures)" or "[n]octurnal episodes manifesting residuals which interfere significantly with activity during the day." 20 C.F.R. Pt. 404, Subpt. B, App. 1, § 11.02. Relevant to this Listing, "[a]t least one detailed description of a typical seizure is required", because "[i]n epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures." *Id.*, § 11.00A. The description of the seizure "includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena." *Id.* "The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information." *Id.*[3]

The ALJ in this case found that while Plaintiff had a severe seizure disorder, he did not meet Listing 11.02 because "he did not have a detailed documented history of daytime episodes or nocturnal episodes with residual effects that occurred more

---

[3] The impairment must persist despite the fact that the individual is following prescribed antiepileptic treatment. *Id.*

frequently than once a month in spite of prescribed treatment." (AR 13.)[4]  I find that the

ALJ erred for several reasons.  First, there is no requirement in the listing that there be

a detailed documented history of the seizures; instead, the listing only requires "a

detailed description of the typical seizure pattern, including all associated phenomena."

20 C.F.R. Pt. 404, Subpt. B, App. 1, § 11.02.  Second, the ALJ did not discuss the

evidence that supported her finding and did not properly consider, even at a later step of

the evaluation, all the evidence relevant to the Listing.

In that regard, Dr. Hein stated that Plaintiff's seizures are uncontrolled and that

he has about 2-3 grand mal seizures per week.  (AR 282.)  Similarly, Dr. Bukowski

stated that Plaintiff suffers from several grand mal seizures per month.  (*Id.* 283.)  This

certainly satisfies the listing requirement that the seizures occur more frequently than

once a month.  Moreover, Dr. Hein notes that she has been taking care of Plaintiff for

some time (*id.* 282), and there is a period of almost five months of treatment between

Dr. Hein's May 8, 2009 report and Dr. Bukowski's October 1, 2009 report.  This alone

demonstrates over three months of treatment, which is also supported by the record of

treatment in this case by Dr. Bukowski, Dr. Hein, and neurologist Dr. Smith.

Further, both Drs. Hein and Bukowski provided a description of the seizures.

Dr. Hein states that Plaintiff is unable to work, drive, or be a fully stable husband or

---

[4] While the Commissioner argues that the ALJ's findings at other steps make clear that she found Plaintiff did not meet Listing 11.02 because he did not prove that he continued to have listing-level seizures despite adherence to prescribed antiepileptic treatment, I disagree.  While the ALJ did refer to failure to adhere to treatment at step four, this does not appear to be a basis for her decision at step three. Instead, the basis for her decision at step three appears to be that there was not a detailed description of the seizures.  Accordingly, I find that this is an improper post-hoc argument.  In any event, I find error with the ALJ's findings regarding failure to adhere to treatment as discussed in Section II.B.2, *infra*.

father because of his seizure disorder, and that every time Plaintiff suffers a grand mal seizure, "it takes an average of 12-24 hours to recover, fully." (AR 282.) She noted that this period is the "'post-ictal' phase", "where the patient requires increased sleep and assistance due to weakness" and where confusion often "intrudes on daily functioning. (*Id.*) Dr. Hein's findings are corroborated by Dr. Bukowski, who states that the post-seizure phase lasts an average of 24 hours for Plaintiff "leaving him basically incapacitated." (*Id.* 283; *see also* 286—Nursing Intake Note.)[5] The ALJ failed to properly consider this evidence in regard to the listings.

It is true that neither doctor indicated the extent to which their description of the seizures reflected their own observations and the source of ancillary information. Rather than attempting to ascertain this information from the doctors or the other evidence, the ALJ improperly rejected the doctors' opinions on the basis that they "were apparently based on claimant's self-reports regarding the frequency of his seizures rather than objective data." (AR 16.) However, an ALJ may not reject the opinions of a physician "based merely on h[er] own speculative conclusion that the[ir] report[s] w[ere] based only on claimant's subjective complaints." *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004). "The ALJ [must have] a legal or evidentiary basis for h[er] finding that [a treating physician's] opinions were based merely on Plaintiff's subjective complaints of pain. *Id.* Here, the ALJ did not state any legal or evidentiary basis for her

---

[5] I discuss the weight the ALJ gave to the opinions of Drs. Hein and Bukowski in the next section.

finding.[6]  Moreover, treating physicians uniformly rely on subjective statements of their

patients in assessing treatment, and there is nothing in the record that indicates the

treating physicians found Plaintiff's complaints to be anything other than credible.  To

the extent the record was unclear as to the issue, the ALJ should have contacted the

physicians about this rather than engaging in speculation.  See *McGoffin v. Barnhart*,

288 F.3d 1248, 1252 (10th Cir. 2002) (citing 20 C.F.R. § 404.1512(e)(1) (2001)).[7]

The ALJ also ignored the fact that Plaintiff's girlfriend, Paula Barela, who lived

with him, noted her observations of the seizures and provided what appears to be a

detailed description of a typical seizure pattern and the associated phenomena.  (AR

37-41.)  Further, Nurse Howard also described the seizures based on information she

learned from Plaintiff and his girlfriend.  (*Id.* 313.)  The ALJ did not discuss this evidence

---

[6] While the Commissioner suggests that the ALJ found Plaintiff's subjective complaints not to be credible, that is not entirely accurate.  The ALJ obviously found Plaintiff's complaints of seizures to be credible to some extent as she found that he had a severe seizure disorder.  However, she neglected to address the key credibility determination—whether Plaintiff's complaints to the doctors about the frequency and severity of the seizures during the relevant time period were credible.  Instead, the ALJ merely found that Plaintiff's statements of the "intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with [the ALJ's] residual functional capacity assessment."  (AR 14.)  This is a boilerplate finding.  It does not specify which parts of Plaintiff's statements are credible and which are not.  Moreover, the ALJ relied on evidence prior to Plaintiff's application date in finding that the medical records did not support Plaintiff's allegations regarding the frequency and severity of his seizures, and did not cite any evidence during the applicable time period to support this decision.

[7] I also question the assumption by the ALJ that there is an objective test to determine the frequency of a person's seizures.  As Plaintiff notes, objective evidence is evidence that can be discovered and substantiated by external testing, while subjective evidence is statements by a plaintiff or other witnesses that can be evaluated only on the basis of credibility.  *Thompson,* 987 F.2d at 1488-89.  "The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'"  *Doyal v. Barnhart,* 331 F.3d 758, 762 (10th Cir.2003).  No disease is *per se* excluded from coverage because it cannot be conclusively diagnosed in a laboratory setting.  *Sisco v. U.S. Dep't of Health and Human Servs.*, 10 F.3d 739, 744 (10th Cir.1993).  Instead, a claimant's disability may "be diagnosed through the use of a technique, either clinical or laboratory, that has been accepted by the medical community."  *Id.*

either in connection with her step three finding.  While she discussed Ms. Barela's
testimony at a later step, she does not explain how it bears on the listing
for seizures.  I find this was error, and that the evidence must properly be considered to
determine if it meets the criteria of the listing.

The evidence of Ms. Barela appears particularly important on this issue as she
describes the seizures and their impact on Plaintiff.  The listing specifically states that
"[t]estimony of persons other than the claimant is essential for description of type and
frequency of seizures if professional observation is not available."  20 C.F.R. Pt. 404,
Subpt. B, App. 1, § 11.00A.  The ALJ did not recognize this, instead giving "little, if any,
weight" to Ms. Barela's testimony.  (AR 17.)

Related to the above, I find that the ALJ erred in regard to her credibility
assessment of Ms. Barela.  First, the ALJ stated that the accuracy of Ms. Barela's
testimony "was questionable" because she "has not been medically trained to make
exacting observations as to dates, frequencies, types and degrees of medical signs and
symptoms."  (AR 17.)  This appears to be clear error in light of the listing's statement
that testimony of lay witnesses is particularly helpful and should be considered in
deciding whether the listing is met.  Indeed, lack of training is never a reason for
rejecting the testimony of an eye witness as to his or her personal observations.

The listing's reference to lay witnesses also suggests that the ALJ could not
discount Ms. Barela's testimony simply because of her personal relationship with the
claimant.  (*See* AR 17.)  Indeed, other than medical professionals, people who have a
personal relationship with the claimant would be the only ones who could provide

testimony about the seizures and their effect on the Plaintiff, particularly given the fact

that Plaintiff is unable to describe his own seizures due to loss of consciousness and

memory.  (*Id.* 35.)  Moreover, the regulations themselves make clear that evidence from

lay witnesses "is relevant to show the severity of the individual's impairment(s) and how

it affects the individual's ability to function."  20 C.F.R. §416.913(d).

    To the extent the Commissioner contends that Ms. Barela's close personal

relationship with Plaintiff might influence her testimony (Resp. Br. at 19), the key word is

"might".  The ALJ rejected Ms. Barela's testimony because it might have been

influenced by the relationship.  However, there is no finding that her testimony was so

influenced, or that Ms. Barela herself was not credible.  This type of categorical

discounting of testimony is contrary to the regulations which acknowledge that friends

and relatives can provide relevant testimony.  20 C.F.R. §416.913(d)(4); *see also* Listing

11.00(A). The law does not presume that a relationship invalidates testimony.

Indeed, the listing makes clear that such testimony may be essential to the

determination of whether the listing is met.

    Finally, I find that the ALJ erred in her assertion that Ms. Barela's statement was

not consistent with the preponderance of evidence of the medical doctors.  (AR 17.)

The opinions of Drs. Hein and Bukowski, as well as the nurse practitioners, support

Ms. Barela's observations, and the ALJ did not identify any evidence to the contrary.

Based upon the foregoing, I find that the ALJ erred at step three.  I also find that the ALJ

erred in assessing Ms. Barela's testimony and her credibility.

2.      Whether the ALJ Erred in Weighing the Medical Opinions of
Drs. Hein and Bukowski

Plaintiff argues that the ALJ did not have proper reasons for discounting the weight of the opinions of Drs. Hein and Bukowski, and failed to account for their opinions despite giving them some weight.  He asserts that these doctors are treating physicians, and that the ALJ erred in not treating them as such.

The ALJ stated that she considered the letters prepared by Drs. Hein and Bukowski which, according to the ALJ, "stated that Plaintiff's epilepsy was uncontrolled despite medication compliance."  (AR 16.)  The ALJ gave "little, and certainly not controlling weight" to these letters, finding that they were "inconsistent with treatment notes that repeatedly indicated that claimant was non-compliant with his medications, did not have his medical levels checked as requested and did not fill his prescription for Topomax despite his neurologist's successful efforts in finding a pharmacy that would accept his insurance."  (*Id.*)

I find that the ALJ erred in her weighing of these medical opinions.  First, since she referenced the term "controlling weight" in regard to her weighing of Drs. Bukowski and Hein's opinions, it appears that she agreed they were treating physicians.[8]   When weighing a treating physician's opinion, the ALJ is required to "complete a sequential two-step inquiry, each step of which is analytically distinct" with regard to their medical opinions.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  "The initial determination the ALJ must make with respect to a treating physician's medical opinion

---

[8] The Commissioner's argument that neither physician saw Plaintiff enough to be a treating physician is an improper post hoc argument.

is whether it is conclusive, i.e., is to be accorded 'controlling weight,' on the matter to which it relates." *Id.* "Such an opinion must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* "If the opinion is deficient in either of these respects, it is not to be given controlling weight." *Id.* But that does not end the inquiry. *Id.*

"Even if a treating opinion is not given controlling weight, it is still entitled to deference; at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser,* 638 F.3d at 1330. "If this is not done, a remand is required." *Id.* As further explained:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to " controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§ ] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96–2p, 1996 WL 374188, at *4 (emphasis added)). "Thus, a deficiency as to the conditions for controlling weight raises the question of how much weight to give the opinion, it does not resolve the latter, distinct inquiry." *Id.* at 1330-31.

In the case at hand, the ALJ did not follow the proper sequential evaluation in determining what weight to give Drs. Hein and Bukowski's opinions.  While she stated

that she was not giving controlling weight to the opinions, she did not consider whether their medical opinions regarding the frequency and impact of Plaintiff's seizures were well-supported by medically acceptable clinical or laboratory diagnostic techniques and were not inconsistent with other substantial evidence in the record.  Indeed, there are many treatment notes relevant to the doctors' opinions which were not considered in the ALJ's decision and which may be relevant to whether their opinions were well supported by medically acceptable clinical or laboratory diagnostic techniques.  Moreover, the opinions of the two doctors corroborate each other, and the treatment notes of nurse practitioners Carla J. Howard and Erin Beatty support the doctors' findings.  (AR 313-325.)

Even if not entitled to controlling weight, it does not appear that the ALJ gave the doctors' opinions deference as required and weighed the relevant factors as to the weight to be given their reports.  At best, it appears that the ALJ may have given a little bit of weight to the opinions of Drs. Hein and Bukowski.  However, I am unable to determine from the record which portions of their opinions she may have given weight to and which portions of the opinions she rejected.  Thus, I cannot meaningfully review the ALJ's decision on this issue.

The ALJ's error is heightened because I cannot determine how she determined Plaintiff's RFC in connection with his seizure disorder.  She did not make a finding as to the type of seizures Plaintiff has, the frequency of the seizures, and/or the recovery time needed after the seizures, which is relevant both to a step three finding as discussed previously and the RFC determination.   While the ALJ stated that she incorporated

restrictions in the RFC assessment "relative to his seizure disorder", she does not

explain what those restrictions are or what evidence she relied on imposing those

restrictions.  This is error because the ALJ's RFC did not "include a narrative discussion

describing how the evidence supports each conclusion. . . ."  SSR 96-8p, 1996 WL

374184, at *7; *see also Moon v. Barnhart*, No. 04-7130, 2005 WL 3446576, at *2-3

(10th Cir. Dec. 16, 2005) (unpublished) (remanding the case where "the ALJ never

specified what he believed the credible medical evidence to be, either for the purpose of

rejecting the doctors' RFC assessments or for the purpose of supporting his own

finding" and where the court was thus unable to determine what evidence the ALJ relied

on in connection with the RFC).  This failure is particularly troubling as the ALJ did not

give any other medical opinion greater weight than that of Drs. Hein and Bukowski.

I also find error with the ALJ's reasons for not giving weight to the doctors'

opinions.  I previously found that the ALJ erred in rejecting Drs. Hein and Bukowski's

findings as to Plaintiff's seizures because they were based on Plaintiff's subjective

complaints.  The ALJ also relied on noncompliance with treatment as a basis to reject or

give "little" weight to their findings.  (AR 16.)  However, even if Plaintiff was

noncompliant, this does not necessarily allow the ALJ to simply discount their other

medical findings regarding Plaintiff's seizures.  A doctor's statements about Plaintiff's

condition or impairments "are specific medical findings".  *Washington v. Shalala*, 37

F.3d 1437, 1439 (10th Cir. 1994).  The ALJ errs in rejecting those opinions in the

absence of conflicting evidence.  *Id.* (finding error with the ALJ's decision to reject the

opinions of treating physicians because the doctors did not provide any examples or

incidents that supported their findings and there were no "results or diagnostic tests of

medical findings which led them to their conclusion" since the finding that Plaintiff's

condition deteriorates under stress is a specific medical finding).

Moreover, I find that the ALJ erred in relying on noncompliance with treatment as

a basis to discount the doctors' findings because she did not consider all the evidence

on the issue or make the proper findings required by law.  The ALJ noted on that issue

that the letters of Drs. Hein and Bukowski were "inconsistent with treatment notes that

repeatedly indicated that claimant was non-compliant with his medications, did not have

his medication levels checked as requested and did not fill his prescription for Topamax

despite his neurologist's successful efforts in finding a pharmacy that would fill his

insurance.  (AR 16.)  The treatment notes do not indicate, however, repeatedly indicate

that Plaintiff was non-compliant with his medication levels.  The only evidence the ALJ

cited in connection with medication is one entry dated September 26, 2008, which

indicated that Plaintiff had not consistently been taking his medication.  (*Id.* 16, 212.)

This is before Plaintiff's onset date and during a period where he had not had seizures

for six months.  (*Id.* 212.)  The ALJ did not cite any evidence afer that date and during

the applicable time period that shows Plaintiff was not taking his medication.[9]

The ALJ also faults Plaintiff for not filling a prescription for Topamax.  However, it

is undisputed that he could not afford that medication.  While she concludes that Plaintiff

failed to obtain this medication "despite his neurologist's successful efforts in finding a

---

[9] Indeed, the blood tests discussed below support a finding that Plaintiff was taking his medication.

pharmacy that would fill his insurance", *i.e.*, CICP (AR 16), CICP is not a health

insurance program.  It merely provides discounted health care services to low income

people. http://www.colorado.gov/cs/Satellite/HCPF/HCPF/1214299805914.  Thus, the

ALJ incorrectly believed that Plaintiff had insurance coverage that would provide free

medications.  Moreover, there is no evidence in the record that Plaintiff could pay even

a discounted fee for Topamax.  Indeed, the evidence showed that Plaintiff was relying

on food stamps to pay his bills and get his medication, and the ALJ did not question

Plaintiff as to whether he could afford to pay for the Topamax.  (AR 28.)  Nurse Howard

appeared to realize this as she later offered information for financial assistance for

Oxcarbazepine.  (*Id.* 315.)

The ALJ also failed to consider whether Topamax or the other medications

discussed in the treatment notes would be more effective than the medication he was

taking.  An ALJ must "apply a particular analysis anytime he relies on a failure to pursue

treatment as a basis to find that claimant is not disabled.  *Fuller v. Astrue*, 766 F. Supp.

2d 1149, 1166 (D. Kan. 2011) (citing *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir.

1993)).  "Before relying on such a failure to pursue treatment, 'the ALJ should consider

(1) whether the treatment at issue would restore claimant's ability to work; (2) whether

the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4)

whether the refusal was without justifiable excuse.'"  *Id.* at 1167; *Thompson v. Sullivan,*

987 F.2d 1482, 1490 (10th Cir. 1993).  The ALJ did not follow this analysis in this

case.[10]   Thus, there was no consideration or finding that Topamax would have restored Plaintiff's ability to work, *i.e.*, by resolving or significantly reducing the seizures.

In any event, it is clear that Plaintiff's doctors thought he was compliant despite his failure to get Topamax or one of the other medications.  Indeed, both Drs. Hein and Bukowski stressed how motivated Plaintiff was, including with obtaining financial assistance.  Dr. Hein states in her May 2009 letter that Plaintiff was "undergoing the application process for medicaid in order to obtain financial assistance, to be able to afford anti-epileptic medications", that he was "a very motivated young man who is desperately trying to alleviate his seizures," that Plaintiff "wants to go back to work and return to highly functioning, but this is impossible at this time", and that the opportunity to live a normal live and return to work were only possible if he was granted financial assistance.  (AR 282.)  Similarly, Dr. Bukowski notes that Plaintiff "is compliant and motivated in regards to his treatment but is not able to afford most of the medications that help him most", that Plaintiff "wants to work. . . but cannot due to his uncontrolled epilepsy", and asks that his Medicaid application be expedited.  (*Id.* 283.)  Similar findings are reflected in other parts of the record.  (*Id.* 286-87, 293, 295.)  The ALJ improperly rejected these findings without discussion.

Finally on the issue of noncompliance, the ALJ and the Commissioner rely heavily on the fact that Plaintiff did not get his medication levels checked despite his medical providers' instructions to do so.  It is true that there was a time period after his

---

[10]   While the Commissioner argues that the ALJ was not required to conduct this analysis, I disagree.  The ALJ's decision regarding failure to pursue treatment was central to her finding to reject the opinions of Drs. Hein and Bukowski and to find that Plaintiff was not disabled by his seizures.

application date when Plaintiff did not get his medication levels checked as ordered, as reflected in the treatment notes.[11] Nurse Beatty requested a Tegretol level check on December 9, 2009.  (AR 325.)  A Tegretol level check was re-ordered on January 11, 2010 and February 9, 2010, after Plaintiff failed to obtain this check.  (*Id*. 319, 321.) However, Nurse Howard confirmed that Plaintiff's Tegretol level was "drawn in June and was 10.7." (*Id*.)  Therefore, Plaintiff did not fail to get his medication levels checked, as the ALJ suggested, but rather merely delayed getting the level checked during a limited time period.  There is no evidence and no finding by the ALJ that this delay was detrimental in any way, or that having the medication levels checked sooner would have reduced the frequency or severity of Plaintiff's seizures.  Indeed, when the levels were checked, Plaintiff was within therapeutic levels, showing he was taking the medication as prescribed.[12]  Moreover, the Tegretol level was therapeutic on January 16, 2009 (*id*. 276), and on October 1, 2009 (*id*. 271, *see also* 275, 300, 310.)[13]  The blood test results ultimately supported the treating physicians' statements that Plaintiff was compliant with prescribed medication.  The ALJ erred in not considering this evidence.

Ultimately, the opinions of Dr. Hein and Dr. Bukowski that Plaintiff was compliant with prescribed treatment should have been given deference and weighed to determine

---

[11] The blood test results relied on by the Commissioner to demonstrate noncompliance that occurred well before Plaintiff's application date (*see* Resp. Br. at 13) are not relevant to whether Plaintiff was compliant during the applicable time period.  Indeed, there is evidence that Plaintiff's seizures were relatively controlled until shortly before the application date.  (AR 212.)

[12] The Commissioner acknowledges that "[d]etermination of blood levels of . . . antiepileptic drugs may serve to indicate whether the prescribed medication is being taken." Listing 11.00(A).

[13]  The Commissioner argues that the blood test in March 2009 shows "barely therapeutic" levels of Tegretol. (Resp. Br. at 13).  I reject this argument.  While the level was "very low normal" (AR 310), it *was* within the therapeutic range.  This does not evidence noncompliance.

if they were entitled to controlling weight.  These physicians had the first hand opportunity to assess the instances of noncompliance, not in a vacuum, but rather in light of the course of treatment that ultimately unfolded.  The ALJ is not entitled to second-guess treating physicians, particularly based on a selective application of the evidence.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008); *Winfrey v. Chater*, 92 F.3d 1017, 1021-22 (10th Cir. 1996).  Nor should the ALJ impose a zero-tolerance policy in regards to compliance; the relevant issue is whether the noncompliance would have impacted Plaintiff's ability to work.  Here, no evidence has been cited for the ALJ for that proposition.

III.    <u>CONCLUSION</u>

Based upon the foregoing, I find that the ALJ erred at step three of the analysis, in evaluating and weighing the opinions of the treating physicians, and in relying on noncompliance as a basis to find that Plaintiff was not disabled.  While Plaintiff requests reversal and an immediate award of benefits, I find that this case must be remanded for further fact finding as discussed in this Order.  *See Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989) (outright reversal and remand for immediate award of benefits is appropriate only when additional fact finding would serve no useful purpose.).  It is therefore

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further fact finding as directed in this Order pursuant to sentence four in 42 U.S.C. § 405(g).

Dated:  March 27, 2014

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge